IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RODNEY LOVE, | ) |
|       Petitioner, | ) ) |
| v. | ) ) Case No. 16 C 6869 |
| DAVID GOMEZ, Warden[1] | ) ) Judge Joan H. Lefkow |
|       Respondent. | ) ) |

## OPINION AND ORDER

Petitioner Rodney Love, an Illinois state prisoner, has applied for a writ of habeas corpus under 28 U.S.C. § 2254. For the following reasons, the court denies Love's application[2] and declines to issue a certificate of appealability.

## BACKGROUND

As summarized by the Illinois Appellate Court on direct appeal, *People* v. *Love*, 377 Ill. App. 3d 306, 308 (2007), or otherwise reflected in the record, on August 28, 2002, a male on a bicycle shot and killed Lyphus Pouncy in Chicago. On September 7, 2002, the Chicago police arrested Love after he dropped a .45 caliber semi-automatic handgun, which firearm, according to the testimony of a forensic expert, matched shell casings found at the scene. (*Id.*)

Chris Young, Pouncy's cousin, testified at trial that he saw a man riding a bicycle shoot Pouncy. (*Id.*) Young, who was under a court order of home confinement, happened to be looking out the window from his third-floor apartment down towards the street. (*Id.*) He was about thirty

---

[1] David Gomez has replaced Walter Nicholson as the warden of Stateville Correctional Center and is hereby substituted as Respondent.

[2] Love filed an amended petition for habeas corpus with the assistance of counsel on July 13, 2020.

feet away from the shooter. (Dkt. No. 91-2 at 521, tr. at YY-54). He had an unobstructed view of the shooter's face and described him as a dark-skinned male with braided hair. (*Id.*) Young did not know Love at the time (Dkt. No. 91-2 at 524−25, tr. at YY-58−59) but he identified Love as the shooter in a lineup on October 2, 2002, and at trial. Significant to Love's claims, Love was the only person in the lineup with braided hair. (*Love*, 377 Ill. App. 3d at 309.) Ronald Neal, a former friend of Love, testified that Love told him shortly after the shooting that he killed Pouncy. (*Id.*)

Love testified, denying that he killed Pouncy. (*Id.*) He stated that Neal came to his house around 2:30 p.m., shortly after the shooting, and told him that Love's cousin Derrick Nash had shot someone. (*Id.* at 310.) He specified that Nash came to his house at about 5:00 p.m. that same day and admitted to shooting Pouncy. (Dkt. No. 91-3 at 336, tr. at AAA-100−101.) Love detailed that Nash had braided hair similar to his. (*Id.* at AAA-102) He asserted that he had been at home with several family members, including his infant daughter, his father, and a friend named Stephanie. (*Love*, 377 Ill. App. 3d at 309.) Love's grandmother testified that she saw Love at home with his daughter when she returned from work in the evening. (Dkt. 91 at 39.) Love's father did not testify. (*Id.* at 19.) Nash was murdered on the same evening that Pouncy died. (*Love*, 377 Ill. App. 3d at 309.)

During *voir dire* on a Tuesday, a juror informed the court that she had surgery scheduled for the following Tuesday. (*Love*, 377 Ill. App. 3d at 316.) The judge responded that she intended to finish the trial by Friday, but she had no control over deliberations. (Dkt. 91-2 at 355, tr. at XX-109.)

The jury retired to deliberate on Monday, November 7, 2005 at 1:30 p.m. (*Love*, 377 Ill. App. 3d at 315.) At 2:15 p.m., the jury sent the judge a note with several questions: (1) "May we

2

see the copy of Officer Keating and Bechina's arresting report 9–7–02? (2) Was the gun ever dusted for prints after arrest on 9–7–02? (3) Was the bike dusted for prints? (4) When and where was the bike recovered?" (*Id.* at 315–16.) After consulting the parties, the court responded at 2:41 p.m., "You have all of the evidence as to these questions. Please continue with your deliberations." (*Id.* at 316.) At 3:32 p.m., the jury sent a note requesting the transcript of Young's and Neal's testimony. (*Id.*) The transcripts were tendered at 3:47 p.m. (*Id.*) At 5:05 p.m., the jury sent two notes to the judge stating, "If all the people do not feel the same, what happen [*sic*]," and "We have 3 Not guilty and the rest guilty." (*Id.*)

Defense counsel suggested the court respond that the jury is hung. The court answered both questions at 5:22 p.m.: "Keep deliberating." (*Id.*) At 5:50 p.m., the jury requested to see "all the defense evidence." (*Id.*) The court responded at 6:30 p.m.: "You have received the evidence. Continue to deliberate." (*Id.*) The defense made a motion for a hung jury. (*Id.*) The court denied the motion. (*Id.*) The jury returned a guilty verdict at 7:20 p.m. (*Id.*) Love was sentenced to fifty-five years of imprisonment, comprising a thirty-year term for the murder and a consecutive twenty-five years as a firearm enhancement. (*Id.*)

On direct appeal, Love argued, among other things, that the trial court misled and coerced the minority jurors into reaching a guilty verdict when it responded "Keep deliberating" to the jury's notes, especially the question about what would happen if they disagreed. (*Love*, 377 Ill. App. 3d at 315.) The Illinois Appellate Court affirmed the conviction on November 5, 2007. (*Id.* at 318.) The Illinois Supreme Court denied Love's petition for leave to appeal (PLA) on March 26, 2008. (Dkt. 91 at 53.)

Love filed a series of *pro se* postconviction petitions and appeals, all of which ended in denial of his claims.³ On March 30, 2016, the Illinois Supreme Court denied his PLA. (*Id*. at 58.)

On June 30, 2016, Love filed a *pro se* federal habeas petition. (Dkt. 1.) He raised several grounds for relief in his form application, including, as relevant here, "suggestive lineup," and "jury matters, argument, deliberations, verdict, and sentencing." (*Id*.) Love's appointed counsel filed an amended application on July 13, 2020. (Dkt. 91.) The amended application claims: (1) jury coercion; (2) ineffective assistance of counsel for not moving to suppress Young's lineup identification; and (3) ineffective assistance of counsel for failing to call Love's father, Robert McCorkle, as a witness. (*Id*.)

## ANALYSIS

### I. Failure to Call Alibi Witness

Acknowledging that he has not exhausted his claim that the failure to call witness McCorkle was ineffective assistance of counsel, Love asks the court to stay this proceeding so he may exhaust his state court remedies. *See* 28 U.S.C. § 2254(b)(1)(A).

If a federal habeas petition has even a single unexhausted claim, the district court may be required to dismiss the entire application and leave the applicant with the choice of either returning to state court to exhaust the claim or amending the application to present only exhausted claims. *See Rose* v. *Lundy*, 455 U.S. 509, 510 (1982). An applicant has exhausted his constitutional claim when he presents it to the highest state court for a ruling on the merits. *Lieberman* v. *Thomas*, 505 F.3d 665, 669 (7th Cir. 2007) (citing *Picard* v. *Connor*, 404 U.S. 270, 275 (1971); *Perruquet* v. *Briley*, 390 F.3d 505, 513 (7th Cir. 2004)). Under *Rhines* v. *Weber*, 544 U.S. 269, 278 (2005), the court should grant a stay to allow the applicant to return to state court

---

³ The court will set these proceedings out only as needed for disposition of the petition inasmuch as the relevant issues have been identified in the amended petition submitted by counsel.

to exhaust his claims when "the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *See Purvis* v. *United States*, 662 F.3d 939, 944 (7th Cir. 2011) (applying *Rhines* to a mixed petition brought under 28 U.S.C. § 2255). Love's failure to exhaust is not intentionally dilatory, as he has been a diligent *pro se* litigant despite his limited legal ability and resources. His claim is potentially meritorious in that McCorkle might have corroborated that he was with Love at home and they heard gunshots at the time Pouncy was killed, and he might have perfected impeachment of Neal.[4]

But Love has not shown good cause for his failure to exhaust. He states that he did not exhaust this claim because his appellate counsel failed to raise the issue on direct appeal, causing forfeiture.[5] He also argues that he referenced potential testimony in his *pro se* postconviction petition but did not frame it as an ineffective assistance of counsel claim because he is not a sophisticated *pro se* litigant. A petitioner's lack of legal knowledge does not constitute good cause "because virtually any *pro se* [petitioner] could meet that standard." *Yeoman* v. *Pollard*, 875 F.3d 832, 837 (7th Cir. 2017) (quoting *Rhines*, 544 U.S. at 277). But apart from whether he identified the proper legal theory, Love did not refer to his father in his postconviction petition

---

[4] In general, a decision not to call a witness is presumed to be strategic unless it is shown that counsel has not investigated the witness. *See Carter* v. *Duncan*, 819 F.3d 931, 941 (7th Cir. 2016) ("[A] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review … [but] "few decisions not to present testimony can be considered 'strategic' before some investigation has taken place.") *Id.* at 942 (quoting *United States* v. *Best*, 426 F.3d 937, 945–46 (7th Cir 2005). Love proffers no evidence, such as an affidavit of McCorkle as to whether he was interviewed by Love's counsel and what his actual testimony would have been. As such, there is little likelihood that the omission was of constitutional dimension.

[5] *See Antoine* v. *Pfister*, 2020 WL 5630423, at *5 (N.D. Ill. Sept. 21, 2020) ("In Illinois, … defendants are "required" to raise [ineffective assistance] claims on direct appeal if they are 'apparent on the record,' or else risk forfeiture.") (citing *People v. Veach*, 2017 IL 120649 ¶¶ 46–47); *Crutchfield v. Dennison*, 910 F.3d 968, 976 (7th Cir. 2018) (*cert. denied*, 139 S. Ct. 1587 (2019). Ineffective assistance based on failure to call a known alibi witness could have been raised on direct appeal.

5

other than to contend that the prosecutor had falsely implied that he had coached his father's potential testimony (dkt. 91-9 at 14). Having raised numerous issues in that petition, Love shows no cause why this issue could not have been as readily asserted. Love's failure to pursue his unexhausted claim, coupled with the Supreme Court's admonition that piecemeal litigation is to be avoided, *i.e.*, a stay "should be available only in limited circumstances," *Rhines*, 544 U.S. at 277, convinces this court that a stay is not justified here.

Alternatively, Love requests leave to delete claim three from the amended petition if the court denies the stay. Under *Rhines*, the court should allow the petitioner to amend his petition to remove any unexhausted claims before dismissing the petition. *Rhines*, 544 U.S. at 278. Accordingly, the court grants Love's request to consider only claims one and two.

## II. Timeliness of Federal Petition

Respondent points out that the amended petition is untimely because, allowing for tolling, the amended petition was due, at the latest, by September 10, 2019,[6] but it was not filed until July 13, 2020, more than 10 months beyond the one-year limit set at 28 U.S.C. § 2244(d)(1)(A); *Day* v. *McDonough*, 547 U.S. 198, 201 (2006). Because of this, any claims in the amended petition must relate back to the original petition. *Mayle* v. *Felix*, 545 U.S. 644, 664 (2005) (pointing out that claims in an amended petition relate back to the original claims for purposes of the statute of limitations under 28 U.S.C. § 2244(d) when "the original and amended petitions state claims that are tied to a common core of operative facts.").

---

[6] The court accepts Respondent's calculation but believes it is inaccurate: Love's conviction became final on June 24, 2008, ninety days after the Illinois Supreme Court denied his postconviction PLA. *Love*, 888 N.E.2d at 1187; *Jimenez* v. *Quarterman*, 555 U.S. 113, 119 (2009); Sup. Ct. R. 13. Once Love mailed his *pro se* postconviction petition on September 15, 2008, the limitations period was tolled until November 28, 2018, because this court stayed this case until the Illinois Supreme Court denied Love's PLA for relief under 735 Ill. Comp. Stat. 5/2-1401(f). *Love*, 111 N.E.3d at 984. Once the stay was lifted on December 11, 2018, Love had until September 6, 2019 to file the amended petition. The difference is not material.

When evaluating whether there is a common core of operative facts, a court must focus on the "separate congeries of facts supporting the grounds for relief" in the original and amended petitions. *Id.* at 661. As examples, the Court noted approvingly that relation back exists where an original petition alleged a *Brady* violation and the amended petition alleged failure to disclose a particular report, or where the original petition challenged the trial court's admission of recanted statements and the amended petition challenged the court's refusal to allow the defendant to show that the statements had been recanted. *Id.* at 664, n. 7 (citing cases).[7] On the other hand, an amended petition does not relate back "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650. *Beason* v. *Marske*, 926 F.3d 932, 938 (7th Cir. 2019) (quoting *Mayle*, 545 U.S. at 650).

The Court's analysis teaches that a change in legal theory, such as where the original petition states facts that amount to an occurrence and the amended petition relies on those facts but asserts a different legal theory, relation back would apply. From this, this court infers that a petitioner need not accurately characterize his claims as ineffective assistance if the facts are presented in the original petition as well as the amended petitions.

Love's original petition made approximately twelve claims, including "suggestive lineup" and "jury matters, argument, deliberations, verdict, and sentencing." Given the most liberal interpretation, as is appropriate for a *pro se* pleading, and in light of the fact that the state court ruled on the issue, the court finds that "suggestive lineup" claimed in the original petition pertains to the claim presented in the amended petition.[8] Similarly, the "jury coercion" claim

---

[7] The footnote also cited 3 J. Moore, *et al.*, MOORE'S FEDERAL PRACTICE § 15.19[2], p. 15–82 (3d ed. 2004) (relation back ordinarily allowed "when the new claim is based on the same facts as the original pleading and only changes the legal theory").

[8] Respondent argues that the suggestive lineup claim in Love's initial petition involved the distinct questions of whether a detective pointed at petitioner during the lineup, whether anyone willing to

7

echoes the argument appellate counsel raised on direct appeal, as well as Love's postconviction petition and appeal. The appellate court rejected the claim, so it is fair to infer that Love was making the same claim in his federal petition. Thus, the court concludes that the amended petition relates back to the original petition on this issue as well.

### III. Merits of Exhausted Claims

An application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)−(2). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

#### A. Claim One: Jury Coercion

Love argues that the trial court's instructions in response to jury questions amounted to jury coercion, a violation of his right to due process of law. The appellate court recited the test for jury coercion as based on the totality of the circumstances, citing *People* v. *Branch*, 123 Ill. App. 3d 245, 462 N.E.2d 868, 78 Ill. Dec. 749 (1984), the same test required by *Lowenfield* v. *Phelps*, 484 U.S. 231, 250 (1988). The circumstances included the knowledge that one juror

---

testify witnessed the detective pointing at petitioner, and what efforts counsel made to seek out such witnesses. This is not a necessary or liberal reading of the text. Claim Two of the original petition made the argument respondent points out, but suggestive lineup is identified as an additional claim on the last page. (Dkt. 1 at 9.)

could not attend the next day, that there were communications from the jury after four-and-one-half hours of deliberations, that they were divided 6-3 in favor of conviction, and that requests from the jury indicated concern about the eyewitness and the witness who claimed that Love had admitted the shooting to him.

The appellate court did not specifically assess the effect on the jury of these circumstances taken together, but it found no error in the trial court's response to the jury's notes under the principles that "a court may not 'hasten' a verdict by giving an instruction intended to coerce jurors into surrendering their views[;] [and a] court's instruction to a jury to continue deliberating should be simple, neutral, and not coercive and should avoid implying that the majority view is the correct one." 377 Ill. App. 3d at 315 (internal citations omitted).

Whether or not the appellate court's analysis was ideal, this court's assessment of the totality of circumstances leads to the conclusion that the jury was not coerced, measured against other Seventh Circuit cases that have applied the *Lowenfield* test. *See United States* v. *Ridley*, 826 F.3d 437, 444 (7th Cir. 2016) (district court did not err, after jury reported impasse, in instructing that it "continue in their deliberations in an effort to reach a unanimous verdict."); *United States* v. *Smith*, 818 F.3d 299, 301 (7th Cir. 2016) (holding issue waived by trial counsel but also stating that a court's note to the jury that "Each of you must continue to deliberate" was within its discretion); *United States* v. *Degraffenried*, 339 F.3d 576 (7th Cir. 2003) (holding that district court did not err in failing to give *Silvern* instruction after foreman reported jury was deadlocked, and stating that a court's instruction to a jury to "Please continue deliberations" was "entirely proper"); *United States* v. *Kramer*, 955 F.2d 479, 489 (7th Cir. 1992) (stating that a court's statement to a jury when it knew there was a holdout juror to "Continue your deliberations" was not coercive); *United States* v. *D'Antonio*, 801 F.2d 979, 983−84 (7th Cir.

1986) (stating that a court's guidance to a jury to "Please continue your deliberations. I shall call you into the courtroom at 4:30 p.m." was not coercive). Love has not cited, nor has the court found, a case in which jury coercion has been established based on facts comparable to those he presents.

Love also argues that the trial court was required to provide a *Prim* instruction to the jury.[9] Unfortunately for Love, there is no Supreme Court precedent that establishes such a requirement. Even the Seventh Circuit has rejected the argument that failure to give the federal courts' parallel *Silvern* instruction[10] is constitutional error. S*ee United States* v. *Ridley*, 826 F.3d 437, 446 (7th Cir., 2016) (holding that failure to give instruction under circumstances similar to this case was not plain error and stating, "[O]ur *Silvern* instruction is a supervisory rule with no 'constitutional overtones.'").

For these reasons, Love has failed to demonstrate that the state court proceedings resulted in a decision contrary to Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented at trial.

---

[9] The *Prim* instruction states:

Your verdict must be unanimous. It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment* * * In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict* * *

*People v. Prim,* 53 Ill. 2d 62, 75–76 (1972).

[10] *United States* v. *Silvern*, 484 F.2d 879 (1973).

## B. Claim Two: Ineffective Assistance[11]

Love argues that his trial counsel provided ineffective assistance by failing to move to suppress Young's lineup identification. To show that counsel was ineffective, Love must prove: (1) "deficient performance–-that the attorney's error was 'so serious that counsel was not functioning as the counsel guaranteed [to] the defendant by the Sixth Amendment'"; and (2) "that the attorney's error 'prejudiced the defense.'" *Weaver* v. *Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (quoting *Strickland* v. *Washington*, 466 U.S. 668, 687 (1984). Scrutiny of an attorney's performance is "highly deferential." *Strickland*, 466 U.S. at 689. Even "professionally unreasonable" errors do not warrant "setting aside the judgment of a criminal proceeding" if the error in question "had no effect on the judgment." *Id.* at 691.

A witness's identification may be suppressed only where law enforcement officers use a flawed procedure that creates a "very substantial likelihood of irreparable misidentification." *Neil* v. *Biggers*, 409 U.S. 188, 198 (1972). *Biggers* instructs that "the totality of the circumstances" is the standard for evaluating claims of suggestive out-of-court identification. "The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199–200. Courts consider whether the procedure was both suggestive and unnecessary, and if so, whether, under the totality of circumstances, the identification remains reliable. *Perry* v. *New Hampshire*, 565 U.S. 228, 238–39 (2012).

---

[11] Respondent argues that this claim is defaulted, but because of the result on the merits the court does not address the argument.

The circuit court held, in rejecting this postconviction claim, that it was barred by res judicata based on the ruling on direct appeal. In that opinion, the appellate court, acknowledging that Young's description of the shooter was not complete or detailed, concluded that the lineup did not create a "substantial likelihood of irreparable misidentification":

> There is no evidence defendant was forced to wear braids at the lineup. All the participants in the lineup shared a similar skin tone and wore neutral clothing. Defendant does not claim any significant physical or racial differences existed, beyond his braided hair. Additionally, Young was able to see the criminal's face at the time of the crime; his identification of the defendant was not based solely on defendant's hair.
>
> We have carefully reviewed the photographs of the lineup in question. We find no evidence of an attempt to focus the witness's attention on the defendant. We also note defense counsel made strategic use of the fact the defendant was the only one in the lineup with braids. Counsel used it to make the claim that Nash, not the defendant, was the shooter, since the evidence showed Nash also was dark-skinned and wore braids. The strategy was unsuccessful, but it was sound.

(*Love*, 377 Ill. App. 3d at 312.)

Under the factors outlined in *Biggers*, there is reason to be skeptical of Young's identification of Love. A cousin of Pouncy, Young was three stories above the scene. He testified that he could see the shooter's face, but the only description he gave described a man with a "dark" complexion. And the shooter quickly rode away on a bicycle and out of sight. Because Young was at a significant distance and the opportunity to observe was brief, a jury could reasonably doubt the veracity of the identification (not to mention that Love testified that Nash also had braided hair). Further, the lineup occurred several weeks after the murder.

But, as the state court observed, all of these factors were explored on cross-examination. As such, it might have worked to Love's advantage. At the least, the court cannot conclude that the state trial court's assessment of the totality of the circumstances was unreasonable or contrary to clearly established Supreme Court precedent.

## IV. Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases and Section 2255 Proceedings provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A habeas petitioner must make a "substantial showing of the denial of a constitutional right" to obtain a certificate of appealability. 28 U.S.C. § 2253(c)(2). This demonstration "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In other words, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003). Because this court does not believe that reasonable jurists would disagree as to its resolution of Love's petition, the court declines to issue a certificate of appealability.

## CONCLUSION

For the foregoing reasons, this court denies Love's section 2254 petition (dkts. 1, 91) and declines to issue a certificate of appealability. The Clerk is instructed to: (1) update the docket to reflect that respondent is David Gomez, Warden, Stateville Correctional Center; (2) alter the case caption to *Love v. Gomez*; and (3) enter a Rule 58 Judgment in favor of Gomez against Love. Any other pending motions are denied as moot. Civil case terminated.

Date: June 2, 2021

_____
U.S. District Judge Joan H. Lefkow